CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

FEB 08 2013

JULIA C. DUDLEY, CLERK
BY: /s/
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| BEVERLY LAFUENTES, | CASE NO. 5:12CV00018 |
| Plaintiff, | |
| v. | REPORT AND RECOMMENDATION |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | By: B. Waugh Crigler<br>U. S. Magistrate Judge |

This challenge to a final decision of the Commissioner which denied plaintiff's September 3, 2008 application for supplemental security income under the Social Security Act ("Act"), as amended, 42 U.S.C. §§ 416, 423 and 1381, et seq., is before this court under authority of 28 U.S.C. § 636(b)(1)(B) to render to the presiding District Judge a report setting forth appropriate findings, conclusions, and recommendations for the disposition of the case. The question presented is whether the Commissioner's final decision is supported by substantial evidence. 42 U.S.C. § 405(g). For the reasons that follow, the undersigned will RECOMMEND that an Order enter DENYING the Commissioner's motion for summary judgment, GRANTING, in part, and DENYING, in part, the plaintiff's motion for summary judgment, and REMANDING this case to the Commissioner for further proceedings.

In a decision dated August 20, 2010, an Administrative Law Judge ("Law Judge") found that plaintiff had not engaged in substantial gainful activity since September 3, 2008, her alleged date of disability onset.[1] (R. 12.) The Law Judge determined plaintiff's obesity, leukemia, affective disorder/ panic disorder with anxiety and depression, degenerative L5-S1 arthritis, and

---

[1] Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A).

1

a history of methadone addiction were severe impairments. (R. 12.) He also concluded that, through the date of the hearing, plaintiff did not suffer an impairment or combination of impairments which met or equaled a listed impairment. (R. 13.) Further, the Law Judge found that plaintiff possessed the residual functional capacity ("RFC") to perform unskilled light work that involves no more than occasional climbing, stooping, crawling, and kneeling.[2] (R. 15.)

The Law Judge also determined that plaintiff had no past relevant work, so he proceeded to the final level of the sequential evaluation.[3] (R. 20.) Notwithstanding his finding that plaintiff suffered severe obesity and an affective anxiety/panic disorder with depression and anxiety, the Law Judge elected not to take testimony from a Vocational Expert (VE). Instead, he made several conditional observations impacting the application of the Medical-Vocational Guidelines ("grids") and found that plaintiff's non-exertional limitations "have little or no effect on the occupational base for unskilled light work." (*Id.*) He then applied § 204 of the grids, 20 C.F.R. § 404.1569, Appendix 2, § 204, to compel a conclusion that plaintiff was not disabled.

Plaintiff appealed the Law Judge's September 22, 2011 decision to the Appeals Council. (R. 133-140.) In its December 10, 2011 decision, the Appeals Council found no basis to review the Law Judge's decision. (R. 1-2.) The Appeals Council denied review and adopted the Law Judge's decision as the final decision of the Commissioner. (*Id.*) This action ensued and briefs were filed.

The Commissioner is charged with evaluating the medical evidence and assessing symptoms, signs, and medical findings to determine the functional capacity of the claimant. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990); *Shively v. Heckler*, 739 F.2d 987 (4th Cir.

---

[2] Light work is defined in 20 C.F.R. § 404.1567(b) as involving lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. A job in this category requires a good deal of walking or standing, or when it involves sitting most of the time, some pushing and pulling of arm or leg controls.
[3] *See McClain v. Schweiker*, 715 F.2d 866, 869 (4th Cir. 1983).

2

1984). The regulations grant some latitude to the Commissioner in resolving conflicts or inconsistencies in the evidence, which the court is to review for clear error or lack of substantial evidentiary support. *Craig v. Chater*, 76 F.3d 585, 589-590 (4th Cir. 1996). In all, if the Commissioner's resolution of the conflicts in the evidence is supported by substantial evidence, the court is to affirm the Commissioner's final decision. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence is defined as evidence, "which reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than preponderance." *Id.* at 642.

Plaintiff asserts that the Law Judge, in finding plaintiff able to perform light work, improperly assessed her credibility, including her complaints of fatigue, improperly ignored opinion evidence from her treating physician and non-medical sources, and erred in not ordering a consultative physical exam. (Dkt. No. 14, at 11-30.) Thus, she contends, the Commissioner's decision is not supported by substantial evidence.

Plaintiff contends that the medical evidence of record corroborates her complaints that her fatigue, pain, and mental disorder significantly limit her function, and, thus, the Law Judge's credibility findings are not supported by substantial evidence.[4] Here, the Law Judge found that plaintiff's leukemia, arthritis, and anxiety/panic disorder were severe impairments, and that her medically determinable impairments reasonably could be expected to produce some of her alleged symptoms. (R. 12, 16.) However, he concluded that plaintiff's statements concerning the intensity, persistence, and limiting effects were not credible to the extent they were inconsistent with his RFC assessment. (R. 16.)

---

[4] There seems to be little debate in this record that, at least during some of the period under consideration, plaintiff suffered addiction to methadone. The Law Judge made no specific findings concerning the effects of her methadone addiction on her credibility. Moreover, plaintiff does not challenge his credibility findings regarding the effects of her obesity.

3

In reviewing a claimant's subjective allegations of the intensity and limiting effects of her condition, the Law Judge was entitled to consider all evidence of record, including the claimant's testimony, medical records, the claimant's daily activities, and the nature of her treatment. 20 C.F.R. § 404.1529(c). While a claimant need not provide objective evidence in support of her subjective allegations, the absence of objective evidence can bear on whether her allegations are found credible. *Hines v. Barnhart*, 453 F.3d 559, 564-565 (4th Cir. 2006).

Plaintiff's alleged date of disability onset is May 1, 2008, the day following her diagnosis of Chronic Lymphocytic Leukemia (CLL) by Dr. Kathleen Stewart, an oncologist. (R. 346.) Plaintiff first reported feeling tired to her primary care physician, Dr. Richard Milligan, in May of 2007. (R. 305.) At that point, she already had a history of anxiety/panic disorder, which was considered to be stable on Xanax. (*Id.*) When plaintiff followed up on July 6, 2007, she reported extreme tiredness and nonrestorative sleep. (R. 306.) Dr. Milligan opined that the fatigue could be caused by her anemia or pneumonia. (*Id.*) In August 2007, plaintiff reported continued fatigue and tested positive for an elevated white count, despite her pneumonia clearing up. (R. 309.) Plaintiff underwent testing at Shenandoah Memorial Hospital (SMH) on October 1, 2007, where the pathologist noted that her results were "highly suspicious for chronic lymphocytic leukemia." (R. 233.) On October 15, 2007, Dr. Milligan stated that plaintiff was "still dragging" but he believed "that this is probably not a leukemia process." (R. 311.)

On January 14, 2008, plaintiff again reported fatigue and Dr. Milligan finally referred her to an oncologist. (R. 312.) Plaintiff returned to her primary care physician on April 10, 2008 where the doctor observed that she "appears to feel very run down." (R. 314.) Tests performed on this date showed that plaintiff continued to have an elevated white count, and she was reminded to set up an appointment with the oncologist. (R. 315.)

4

Plaintiff finally saw Dr. Stewart on April 30, 2008 and reported being excessively fatigued. (R. 345.) Dr. Stewart noted that this could not be caused by her anemia, which had resolved after a NovaSure procedure. (*Id.*) Dr. Stewart informed plaintiff that her most likely diagnosis was that of chronic lymphocytic leukemia, and she ordered tests including flow cytometry and a PET scan. (R. 346.) On June 10, 2008, plaintiff returned to Dr. Milligan, complaining of bone pain and requesting a prescription for methadone. (R. 317.) Dr. Milligan consulted with Stewart, who did not believe that her CLL could be causing enough pain to need narcotics at this stage, so he prescribed Ultram instead. (*Id.*)

Plaintiff followed up with Stewart on June 13, 2008, continuing to report fatigue. (R. 344.) Dr. Stewart indicated that CLL is "a disease that we simply monitor and intervene with treatment only as she becomes cytopenic or symptoms dictate." (R. 344.) She also opined that plaintiff's "fatigue certainly could be from the CLL but the, 'total body pain', is not." (*Id.*) Plaintiff underwent a PET scan on June 20, 2008, which showed no abnormal foci of hypermetabolic activity, but did show spurious uptake in the gluteal region, nose, and nasopharynx as well as scattered tiny nodular densities within the subcutaneous adipose tissues. (R. 245.) On June 30, 2008, Stewart noted that the PET scan showed no abnormalities, and she diagnosed plaintiff with Stage 0 CLL, which Stewart did not believe would require intervention for years. (R. 343.) Plaintiff still reported fatigue and pain, though Stewart did not believe they likely were caused by the CLL. (*Id.*)

Plaintiff presented to the emergency room on July 1, 2008, complaining of shortness of breath and nausea. (R. 275.) The ER report revealed that plaintiff was experiencing psychosocial stress at home, and observed that she had a flat affect, a fever, and questionable mild lobe infiltrate. (R. 275-276.) There being no evidence of a pulmonary embolism or clinical

5

suspicion for pneumonia, plaintiff was released with instructions to follow up with Dr. Milligan.
(R. 276.) On July 7, 2008, plaintiff returned to Dr. Milligan and again requested a prescription
for methadone, admitting that she had been getting it off the street. (R. 320.) Dr. Milligan noted
that her CLL was not advanced enough to be causing pain, but stated that plaintiff "does have
L5-S1 arthritis and she has a lot of chronic pain, no doubt about it." (*Id.*) Dr. Milligan did not
want to prescribe methadone because of her risk for addiction, and because of his uncertainty
about how much of plaintiff's pain was real. (R. 321.) Instead, Dr. Milligan referred plaintiff to
the Pain Relief Center. (*Id.*)

On August 28, 2008, Dr. Stewart noted that plaintiff remained stable, and that she denied
symptoms other than fatigue. (R. 342.) On October 17, 2008, plaintiff sought counseling at the
Center for Hope, where she saw Robin Windsor, LPC-C. The therapist stated that plaintiff's
problems included a diagnosis of leukemia, extreme lethargy, and the fact that her son had been
placed in foster care because plaintiff was no longer able to care for him. (R. 377.) The therapist
observed that plaintiff appeared disheveled, walked slowly, and had a flat affect and depressed
mood, and she estimated her Global Assessment of Functioning (GAF) at 59.[5] (R. 379.) On
October 28, 2008, plaintiff presented to Dr. Milligan complaining of fatigue. (R. 448.) He
observed that her lymph glands were positive and "much more impressive than I have seen them
before." (R. 448.) Dr. Milligan reported that her range was normal, except for forward elevation
of both her left and right shoulders, which was limited to 120 degrees. (R. 350.)

On January 12, 2009, plaintiff reported to SMH and requested a referral for Methadone
detoxification. (R. 356.) Plaintiff was discharged with instructions to connect with Northwestern

---

[5] The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning "on a hypothetical continuum of mental health-illness." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 1994) (DSM–IV). A GAF of 51 to 60 indicates the individual has "[m]oderate symptoms...or moderate difficulty in social, occupational, or school functioning...." DSM–IV at 32.

Community Services, though it was later learned that the only facility available was in Washington, D.C. (R. 358-359.) On January 19, 2009, Dr. Milligan observed that plaintiff was undergoing withdrawal from methadone. (R. 447.) On February 5, 2009, plaintiff followed up with Dr. Stewart, who noted that she continued to complain of excessive fatigue for which no treatment was indicated. (R. 374.) On April 17, 2009, Catherine Mendoza, LPC, the in-home counselor for plaintiff's son, wrote a letter stating that plaintiff "was often in bed but was up, or got up, when I visited about 66% of the time." (R. 385.)

On April 30, 2009, plaintiff saw her new primary care physician, Susan Moose, M.D., who noted that plaintiff's low back pain was poorly controlled, and that she suffered possible arthritis in her left knee. (R. 445.) On May 7, 2009, plaintiff returned to Dr. Moose who observed that lumbar spine film showed mild arthritis with no evidence of disc disease, for which she prescribed continued oxycodone for pain. (R. 439.) On May 11, 2009, plaintiff followed up with Dr. Stewart, complaining of excessive fatigue and depression. (R. 405.) Dr. Stewart noted that plaintiff's white blood cell count continued to elevate, but was not in itself an indication for treatment, so they would "continue just to follow her expectantly." (*Id.*) Plaintiff presented with blood pressure issues on May 21, 2009, for which she was prescribed lisinopril. (R. 438.) Follow-ups on June 8 and July 6, 2009, revealed that plaintiff's blood pressure was well controlled by the medication. (R. 436-437.)

On August 5, 2009, plaintiff again saw Dr. Moose, to whom she reported poorly controlled pain and a fever. (R. 435.) On the same day, plaintiff also saw Dr. Stewart, who noted that plaintiff continued to complain of excessive fatigue and depression, and that she had a persistent viral illness with a low grade fever. (R. 404.) Dr. Stewart requested CT scans to check the progress of plaintiff's CLL. (R. 404.) On September 2, 2009, Dr. Stewart reported that the

CT scans showed no central lymphadenopathy or organomegaly and opined that patient's current condition did not warrant treatment. (R. 401.) On September 14, 2009, plaintiff presented with an upper respiratory infection and a possible infected insect bite. (R. 433.) On October 22, 2009, because of loss of her insurance, Dr. Moose referred plaintiff to the free clinic where she would be able to continue receiving her pain medication. (R. 432.)

On December 7, 2009, Dr. Moose referred plaintiff to physical therapy because her pain was poorly controlled with the oxycodone. (R. 431.) Plaintiff was also given a prescription for methadone. (R. 431.) On December 9, 2009, plaintiff had her initial evaluation for physical therapy. Plaintiff reported that she was only able to stand for ten minutes and has difficulty bending down. (R. 395.) She stated that her constant pain was currently a 5 out of 10 and, at best, was a 4 out of 10. (*Id.*) On December 14, 2009, plaintiff reported that she had been taking the methadone as prescribed and it was helping with her pain. (R. 424.) After six physical therapy visits, plaintiff's gait had improved, but her pain level had not decreased. (R. 388.) Physical therapy was discontinued on January 20, 2010 in favor of home exercise and other methods of pain control. (*Id.*)

On March 3, 2010, Dr. Stewart revealed that plaintiff's white blood cell count was only slowly increasing and that she did not have any symptoms referable to the CLL. (R. 399.) Dr. Stewart opined that plaintiff likely would not need treatment for quite some time. (*Id.*) On April 23, 2010, plaintiff followed up with Dr. Moose. (R. 415.) She reported continued fatigue, but her pain was "relatively well controlled with methadone." (*Id.*)

On July 14, 2010, plaintiff followed up with Dr. Moose, reporting that she was having increased daily back pain. (R. 414.) Plaintiff had two episodes of muscle cramping during her doctor's visit. (*Id.*) Dr. Moose sent plaintiff to SMH for further testing, which was completed on

8

July 16, 2010. (R. 408-411.) Plaintiff's cervical spine, left hip, and left tibia and fibula appeared normal with minimal calcification along the anterior longitudinal ligament and some sclerosis at the pubic symphysis. (R. 408, 410-411.) Plaintiff's lumbar spine, however, showed "fairly marked disc narrowing at L5-S1 with a vacuum phenomenon" and "degenerative changes in the lower facet joints bilaterally." (R. 409.) The last entry in this record was a letter report of Dr. Moose dated July 20, 2010. (R. 449.) Dr. Moose wrote that plaintiff experienced a mild reduction in strength in her lower extremities, reduced range of motion in her left hip, and slow mentation and decreased cognitive functioning indicative of mild mental disability. (*Id.*) She also noted that plaintiff's pain had been relatively well controlled with medication, and that she "would benefit from an evaluation by physical medicine and rehabilitation and also by psychiatry." (R. 449.)

It is clear to the undersigned, as the Law Judge essentially found, that plaintiff's CLL is an impairment which reasonably could be expected to cause fatigue. Once the claimant has established a medically determinable impairment likely to produce subjective symptoms, subjective evidence alone can be the basis of a disability finding. *Hines v. Barnhart*, 453 F.3d 559, 564-565 (4th Cir. 2006.) In that connection, the record is replete with evidence of plaintiff's fatigue. Dr. Stewart, plaintiff's oncologist, certainly was of the view that plaintiff's "fatigue certainly could be from the CLL", thus dispelling any lay notion that Stage 0 CLL was incapable of producing the level of fatigue of which plaintiff complained. (R. 344.) Nevertheless, the Law Judge considered this only as "minimal objective evidence of irregularity" which, in his view, did not support the plaintiff's complaints of fatigue. (R. 19.) To this extent, the undersigned believes the Law Judge substituted his judgment for that of plaintiff's specialist, thus improperly impacting his eventual decision on plaintiff's residual functional capacity.

9

The undersigned also has difficulty with the Law Judge's assessment of plaintiff's daily activities and their effect on his determination of her work-related capacity. The Law Judge noted that plaintiff has been forced to give her son up for adoption, but found that "[d]espite her residual limitations, Ms. Lafuentes continues to take care of some personal needs, brush her teeth, use the restroom, prepare simple meals, clean, ride in a car, read, watch television, and socialize with her children, albeit at a slower pace and taking account of the limitations from her impairments." (R. 19.) Plaintiff's main allegation is that her fatigue prevents her from performing sustained activity on a competitive basis.[6] The Law Judge's list of extremely limited daily activities appear to be the bare minimum necessary to care for oneself, and they do not provide substantial evidentiary support for the Law Judge's RFC finding which would allow plaintiff to perform any range, much less a limited range, of light work.

Plaintiff also challenges the Law Judge's decision to rely solely on the Medical-Vocational Guidelines to compel a conclusion that plaintiff was not disabled without taking vocational testimony. She asserts that the Commissioner has not met his "burden to rebut [plaintiff's *prima facie*] case with substantial evidence that she can perform alternative jobs which exist in significant numbers in the national economy." (Dkt. No. 14, at 11.) In that regard, the Medical-Vocational Guidelines are intended to direct a finding when a claimant has solely exertional impairments. 20 C.F.R §404.1569. App. 2, §200.00(e). The impairments the Law Judge, himself, found to be severe were almost entirely non-exertional impairments and included her pain, fatigue, and mental disorder. "Individualized consideration must be given when non-exertional impairments further narrow the range of jobs available to the claimant." *Grant v. Schweiker*, 699 F.2d 189, 192 (4th Cir. 1983.) *See also Lightfoot v. Astrue*, 2008 WL 194287

---

[6] Plaintiff testified, which was not contradicted, that she only microwaves and does not clean. (R. 39-41.)

(W.D. Va. Jan. 22, 2008) ("When a claimant demonstrates the presence of non-exertional impairments, the ALJ cannot rely exclusively on the grids, which may only serve as guidelines, but must solicit testimony from a vocational expert.")

Now, in some instances where non-exertional limitations are produced by impairments which ordinarily have exertional effects, the undersigned will give deference, as required by the regulations, to a Law Judge's resolution of a claimant's credibility as a basis for an RFC determination. Here, however, there is no question that plaintiff has struggled with prescription drug addiction which the Law Judge extensively found to be a severe impairment. The Law Judge may have believed that plaintiff's extensive efforts to obtain methadone affected her credibility regarding the need for pain medication, but he failed he did not find that her addiction, in any way, impacted her credibility. Moreover, her physician was of the view, after alternative methods of treatment had failed, that plaintiff was in enough pain to require prescribing methadone despite the danger of addiction. To the extent that the Law Judge may have believed plaintiff to be a malingerer using every means available to secure drugs, her addiction does not negate the fatigue revealed in her medical record, nor the reasons for her decision to give up her son for adoption.

In addition, the very impairments which the Law Judge determined had been proven to be severe clearly produce non-exertional limitations on plaintiff's ability to work, especially persistent fatigue. As stated, plaintiff's persistent fatigue is documented by all those who treated her, and its effects essentially are not controverted by any of those individuals who had personal contact with her. The Law Judge only noted her complaints of fatigue, made no determination of its severity and did not address it in his RFC. The undersigned cannot help but believe that the Law Judge avoided having to address the effects of plaintiff's non-exertional limitations

11

produced by her chronic fatigue in order to avoid the risk that a VE would testify that no jobs would be available to a person with the limitations produced by such fatigue. Whether a VE might reach the same conclusions compelled by the grids once the non-exertional effects of plaintiff's impairments have been fully considered depends on a number of factors which the current record fails to address and which need further development.

Therefore, it is the undersigned's view that the presence of a VE at the final sequential level was required by the Commissioner's own regulations, that the Commissioner failed to discharge his sequential burden by not having one at the hearing, and that good cause has been shown to remand the case for further proceedings at which a VE can be examined and where both sides should be entitled to introduce additional evidence relevant to the period under consideration. It is so RECOMMENDED.

Should this recommendation be adopted, then plaintiff's contention that the Law Judge erred in not ordering a consultative examination (CE) becomes moot. However, the undersigned will address the issue in the event the recommendation is not adopted.

Certainly, under the regulations, a Law Judge may order a CE pursuant to 20 C.F.R. § 404.1519a. The purpose of a CE is "to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient." *Id.* While the Law Judge generally has wide discretion in choosing whether to order a CE, there is rather a dearth of evidence regarding the vocational effects of plaintiff's mental disorder. To repeat, the non-exertional limitations presented by plaintiff's non-exertional mental condition are critical. Plaintiff consistently took Xanax for a previously diagnosed panic disorder, and was treated by a therapist at the Center for Hope who was not available to complete the requested Mental Status Evaluation Form. (R. 376.) At a minimum, plaintiff should be given an opportunity to secure that evidence, and, if she cannot do

12

so after a good faith effort, then the Law Judge will be in a position to determine whether a consultative examination will be ordered.

For all these reasons, it is RECOMMENDED that an Order enter GRANTING plaintiff's motion for summary judgment to the extent that the case is to be remanded for further proceedings, DENYING the Commissioner's motion for summary judgment, and REMANDING the case to the Commissioner for further proceedings to reassess plaintiff's residual functional capacity and to take vocational evidence relevant to the final question in the sequential process.

The Clerk is directed to immediately transmit the record in this case to the presiding United States District Judge. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note objections, if any they may have, to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(l)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection. The Clerk is directed to transmit a certified copy of this Report and Recommendation to all counsel of record.

ENTERED: /s/ 
U.S. Magistrate Judge

February 8, 2013
Date